May it please the Court, good morning. My name is Corrie Hong, and I represent Petitioner Jesus Lemus-Everado, who I will simply refer to as Mr. Lemus. There are three reasons as to why this Court should grant his petition for review. In the first reason, the BIA minimized the claim of torture from being a fear of wrongful imprisonment and assassination, because he was a former gang member, to being simply a fear for arrest at the airport for having tattoos, followed by an immediate release of custody. The BIA distorted Mr. Lemus' testimony. He testified that he feared corrupt police officers, death squads, and rival gang members, and under such situations, the BIA cannot disregard the actual claim and instead decide a minimized, discounted claim in order to deny release. Can you tell me, counsel, what's the best evidence presented to the BIA or the IJ that your client had a realistic fear of not just of persecution, but of torture? His own testimony, which under CAT is taken into account, the expert testimony, which went into detail about the past harms that other people whom he was aware of experienced, and then also the country condition report, including those prepared by the U.S. State Department, all document the extent of corruption with the Guatemalan government and rogue police officers and death squads that seek to harm and kill ex-gang members. Is your argument just that there's insubstantial evidence to support the BIA's decision here or the IJ's decision here? Is that really what it boils down to? Well, yes, because the BIA simply distorted the record. It minimized the claim's harm to be something much less serious than what Mr. Lemus argued, and also, secondly, it cherry-picked the record. It relied on one letter written by the State Department, which expressly, in its own rendition of the facts, made it very clear that it was not a comprehensive investigative report, but rather only reciting information that it was aware of that had been reported to the U.S. Embassy. This letter, which conditioned and qualified itself, the BIA improperly magnified to trump hundreds of pages of country condition reports of very credible, reliable experts, and also Mr. Lemus' own testimony. So the BIA did not consider all of the evidence. I was going to say, so your argument is not so much – I guess your argument is that although there is evidence, the BIA didn't consider everything? Is that correct? Correct. When I read the IJA's decision here, it was pretty thorough. And though you may disagree with the way in which he looked at the evidence, how could we say that the IJA and then the BIA didn't fully consider the entire record? Well, because the BIA issued its own reasoned decision that the review was to find just the BIA's decision. And the BIA had a different decision than what the IJA did. The IJA recognized that Mr. Lemus feared death squads, whereas the BIA simply said that he feared just a brief arrest and imminent release at the airport. So the BIA decision is what the focus needs to be on. And there the BIA simply just minimized again and again. It's not taken into account all the evidence that it should have. And because this is a CAD claim, which is mandatory and is based on a treaty, there is an obligation for the fact finder to be able to look at all basis of evidence, which is what the BIA erred in this particular case. As I read the IJA and the BIA decisions together, and I understand your argument that we ought to only focus on the BIA decisions, it does look to me as if the expert testimony was discounted because the IJA thought it didn't have sufficient foundation. And he was specifically critical of how she was specifically critical of how many of the size of the sample and things like that. What's wrong with that? What's wrong with the finder of fact listening to an expert, admitting the evidence, and then saying, I don't find it convincing? There's nothing wrong with that. Unfortunately, that's not what happens here. The BIA did not fight any problem with the expert. The BIA did not find the expert not credible. Rather, the BIA or the IJA, for that matter, simply cannot accept otherwise admissible credible evidence and simply discard it on its own volition for its own whim. It has to have a reason. It has to be contradicted. It has to have other evidence to rebut it, not simply. Well, it wasn't. I'm sorry. This is the difficulty with the telephone. I thought the IJA here was fairly specific in saying, I heard this testimony. Here's what he said. But I don't find it very convincing because, and it had a bunch of reasons. One of them was the sample was relatively small. Another was that some of the people who were in the sample had experiences different than others. And he did want to find her a fact. He may have gotten it wrong, but that's not why we're here. He did want to find her a fact, typically does. She did. She went through the expert testimony and said, I don't find it particularly helpful. I'm trying to figure out what the difficulty with that is in terms of our appellate review. Well, first of all, the appellate review has to be confined to the BIA decision. But even looking at the IJA decision, there is longstanding precedent where the IJA cannot disregard expert testimony based on speculation alone. They have to cite specific evidence to discount or undermine it. If the expert is found credible, which the IJA did, it cannot then just cherry pick that testimony. It has to take into account and have to look at the whole picture. And even though the IJA did a much better job of that than the BIA, the BIA in particular just simply disregarded it wholesale, instead relying simply on the advisory letter to discount the expert testimony, which is an improper use of the advisory letter, which the authors of the advisory letters themselves did not intend to plant specific knowledge. So is it your position that what we ought to be doing is remanding to the BIA to fully consider the IJA's decision? No. No, Your Honor. The BIA has the authority under the regulations to look at the record and make its own findings of the law and review the IJA findings for clear error. The Ridori case, which was decided after the BIA, had made that less clear, so arguably I think that could be an issue for the BIA to do, that it cannot simply disregard IJA findings without an express finding of clear error, which it did not. Moreover, the BIA has to look, has to consider the entire record. Well, but here's the difficulty I'm having, and maybe I'm just confused about your argument. What you're saying is the IJA may have made a bunch of findings, but the BIA made fewer, and therefore we can only look at the BIA's decision. And I guess my question is, if you're right in that, don't we have to send it back to the BIA and say, what do you think of the rest of the IJA's findings? Well, under Ridori, which is the case that came out, I filed a Rule 28 letter last night with the court. Ridori came out last year, well after the briefing occurred. And under Ridori, I think this would be very much a Ridori error, which is how you're classifying it, that the BIA simply can't disregard the IJA's findings, which it did in this instance. Unfortunately, this was briefed without the benefit of Ridori, so that wasn't fully briefed, but I agree that it is a Ridori error, and that could be a basis. Excuse me, but if you look at the Ridori error case, if you look at Ridori, they were looking at a determination that the IJA's report was rejected. There was no explanation for rejecting the IJA's opinion. In this case, the BIA is really saying that its determination is complementary to the IJA. And it sounds to me like your entire argument is that we ought to substitute our judgment for the IJA and the BIA's. And if that's not what your argument is, why am I wrong? Well, Your Honor, it's similar to the Ridori case in that the BIA simply had its own facts. And Ridori said that under the BIA's own regulations, it has to clarify which findings it's rejecting under clear error. And the BIA did not do that in this instance either. So it applied the wrong standard of review. But back to your larger question as to what's wrong with this decision, even just looking at the BIA decision, under the substantial evidence standard, this Court does have an obligation to look at the evidence of the whole and if the BIA's findings are contrary to substantial evidence, reversal is warranted. And that is the thrust of my argument, that there's simply too much evidence and the BIA simply does not. Ms. Hahn? Yes. Did you have a question? Yeah, I have one more question. I know you've been out of time. I'm looking at the third page of the Board's decision. And the first two, the three paragraphs on that page purport to review the evidence before the IJA and say that the IJA was correct on these facts and not granting cat relief. What's missing on that page? What's missing on that page that should lead us, even if your argument's right, on the merits of the BIA's review? What's missing on that page that was in the IJA's decision that they ignored? That they ignored in the IJA decision? Yeah. The third page seems to be a pretty comprehensive summary of what the IJA held and they said we think she was right. Is there something missing there? Well, yes. The IJA recognized that there was a fear of assassination where the third paragraph simply says that it's lawful arrest and lawful imprisonment would not equate to torture. So it did not understand the true fear, the true harm that Mr. Lemos claimed to fear as well as what was reported in the contradictions at the expert testimony. Okay, thank you. Okay. Thank you, Ms. Wong. We're going to go to the government now. Good morning, Your Honors. May it please the Court, my name is Dara Smith and I represent the Attorney General. Ms. Wong, can you hear the government's attorney? Yes, I can. Thank you. Good morning. In this case where cat protection is the only issue, the record does not compel the conclusion that Mr. Lemos met his burden to show that it was more likely than not that he would be tortured by the Guatemalan government or with its acquiescence. There's no past harm at issue here, so the only question is that of future torture. I'd like to go ahead and address the scope of review issue that the Court was discussing a moment ago, the Radore issue and whether to review the VA's decision or the IJA's decision. In fact, so Radore is about the Board's scope of review and says that the Board can't do independent fact-finding. Right. But as the Court has noted, if the Board agrees with the immigration judge, then the Court can review both decisions together. And especially in a case like this where there's an affirmance, it makes sense to look at the two decisions together. But to the extent that the Board doesn't address all of the issues that the IJA addressed, of course, the Court may look at the immigration judge's decision because the Board agreed, but the Board was addressing the arguments made on appeal. So if you look at the Petitioner's brief that was before the Board, it didn't focus on those claims that the Board didn't focus on. So it said one sentence about the Petitioner's likelihood of going to prison, but essentially nothing about all of these claims of deliberate harm in prison that are being alleged in the current brief or anything. So is it your position those claims are not exhausted? Yes, Your Honor. I believe that specifically the claim about rival gang members is just nowhere in the brief before the Board. The idea that they would – that the government would acquiesce in gang members harming the Petitioner if he were to be returned, it's just simply nowhere in the brief before the Board. And that's why the Board's decision doesn't address it. It just wasn't raised there. Is there an argument on the brief to the BIA that the IJA's factual findings were clearly erroneous? I'm not sure if it was phrased that way. Essentially it alleged that the immigration judge erred, generally speaking. The Board, of course, determined that the immigration judge was not in error by agreeing with the immigration judge. So by saying we agree and then going on to explain its own reasoning for why it agreed and why it wasn't persuaded by the expert testimony, the Board didn't find any of the findings clearly erroneous. And we would have a problem if the Board had made its own findings and talked about findings. But that's not what happened here. So in general, you positioned it, and this is the way I had understood it before the argument this morning, is that when the Board affirms the IJA and says we've reviewed the evidence and thinks the IJA did this correctly or had substantial evidence before her, they need not recount each piece of evidence in their affirmance. That's exactly right, Your Honor. I mean, the Board cannot go through and list every single piece of evidence that was submitted to the immigration judge and explain why it does or doesn't support the conclusion that it's coming to. And this Court has numerous cases finding that. And there's a problem if it's clear that the Board is saying something that's absolutely contrary to the record. And we have some cases in which that's been unfortunately true, that the Board has just ignored compelling evidence. And that's the standard here. If there's evidence that the Board completely ignored something compelling, then, of course, reversal is warranted. But that's not the case here. As the Court pointed out, the Board was simply, like the IJA, just not persuaded by the expert testimony. You've drawn three this morning, and they all involve expert testimony about tattoos. Can you address in this case why you think the IJA handled this correctly or whether there was some difficulty with it and what the appropriate way to handle this is? Certainly, Your Honor. The immigration judge considered the expert testimony, discussed it, and determined that she just simply didn't agree with his conclusion. Effectively, the expert in this case, who's also the expert in the second case on the docket this morning, discussed his impressions, the results of his interviews with a certain subset of the population in Guatemala in this case, and basically testified that people had had problems with the police, but he only said that two of the people he had interviewed were actually arrested at the airport. And then when pressed on cross-examination, basically said, sometimes they let you go, sometimes they take you to jail. Couldn't explain why they let some people go and didn't let others go. And for the immigration judge, in the absence of any sort of statistical information or anything more than this anecdotal evidence, it just wasn't enough to compel her I'm sorry, it's not compelling evidence at that stage, but to result in a finding that it was more likely than not that he would be tortured by the government. It just was too anecdotal and too inconsistent as to what might actually happen. As I understand the expert's report or testimony in this case, it was based entirely on interviews with people who returned to the country who purported to be gang members? Wasn't there more? If I'm not mistaken, it was mostly that. I mean, he has traveled to these countries, he's interviewed a lot of people, and this was his field of study, and nobody was questioning his expertise. I'm sorry, Your Honor. I'm sorry. Did he really say he interviewed a lot of people? I think he said he interviewed ten people in Guatemala. He did say he interviewed ten people, Your Honor, in this case. I'm not sure if he had done previous interviews with other people on other occasions, sort of on previous visits, but it certainly wasn't any kind of comprehensive review. And the immigration judge didn't discredit him. She just didn't agree with his conclusion about the likelihood of torture in this case, simply because of that anecdotal evidence. She didn't put much weight on his testimony. That's correct. She didn't give it much weight. That's exactly right. And the board similarly said that they weren't persuaded by the expert testimony. And that's not rejecting it as incredible. They don't have to accept his factual statements as true. And this Court actually said that in Aguilar-Ramos. Well, they could agree with it, that he's, you know, they have no reason not to believe that he interviewed ten people. They just said we don't give it that much weight because it's such a small sample size. That's exactly right, Your Honor. I mean, he's telling the truth, and that is credible. But that doesn't mean that it meets Mr. Lemus's verdict. What was the counter? What was it weighed against? What evidence in the record did she weigh it against? The main evidence was the country reports and the letter from the State Department. As I understand it, we have a letter from the State Department and two country reports here? That's correct. I believe it's 2005 and 2007, those country reports. And the main things that they said were that the government was likely to possibly arbitrarily arrest and detain people who are suspected of being gang members. And that's essentially what the immigration judge found, that that was likely to happen, that Mr. Lemus was likely to be detained, possibly imprisoned arbitrarily and without process, but that's not torture. And that's actually exactly what the letter from the State Department says, is that there are reports of the police arbitrarily arresting gang members, even charging them with false crimes, but not torturing them. Is there anything in the country reports, in your view, that supports the claim of likelihood of torture on return? There is certainly evidence in the country reports that there have been accusations of harm, that there have been – that there is some corruption and that there are police officers who unlawfully kill people. In the country report the immigration judge discussed, I believe there's one killing of a gang member. And so it's possible, and there is evidence that could possibly support the contrary conclusion that, as this Court has said many times, that's not really the question here. It's not about reweighing the evidence and seeing if there is some evidence in support of the contrary claim. It's whether there's compelling evidence, and that standard simply hasn't been met. So there's not a total dearth of evidence, but that doesn't mean that the agency could not have reasonably decided the way that it did. I don't know just what's going on here. Okay. Thank you, Your Honor. Ms. Hahn, I'll give you a minute to respond. Thank you, Your Honor. I just have three quick points. The first is that the BIA's findings, and the IJ's findings, that there isn't torture and there isn't specific intent and there isn't acquiescence, was decided without the benefit of the Rodori case and the Madrigal case and the Cole case decided in the Ninth Circuit, in which there were similar situations in which former gang members were able to show specific intent of harm and acquiescence when there's a level of corruption between the government and the criminal gangs. That is established on this record based on the testimony of the Country Condition Report, which shows that the prison guards are giving weapons to gang members for the purpose of killing other gang members in prison. In that case, it's very analogous to the Rodori and Madrigal. The other issue is that the BIA did not expressly adopt the IJ's decision until they said they agree with it. With the absence of the adoption language, the IJ's findings are not incorporated into the IJ's decision. Okay. Okay. Thank you. Okay. Thank you very much. Thank you. The matter will be Lemos Everado will be submitted at this time. Thank you, Counsel. We appreciate your arguments.
judges: Erickson, Paez, Hurwitz